1  BENJAMIN B. WAGNER
   United States Attorney
2  JEFFREY A. SPIVAK
   Assistant United States Attorney
3  United States Courthouse
   2500 Tulare Street, Suite 4401
4  Fresno, California 93721
   (559) 497-4000  Telephone
5  (559) 497-4099  Facsimile

6  Attorneys for the United States

FILED

DEC 2 3 2015

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
              DEPUTY CLERK

7

8                 IN THE UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

SEALED

11  UNITED STATES OF AMERICA,          CASE NO. 1: 1 5 CV - 0 1 9 0 9 LJO SAB

12                Plaintiff,           **VERIFIED COMPLAINT FOR FORFEITURE**
                                       *IN REM*
13        v.

14  APPROXIMATELY $50,000.00 SEIZED
    FROM THE CALIFORNIA FRANCHISE
15  TAX BOARD, SOURCED FROM FUNDS
    WITHDRAWN FROM BANK OF AMERICA
16  SAVINGS ACCOUNT NUMBER
    325016557963, HELD IN THE NAME OF
17  MARTEL 3D, LLC AND/OR PROPERTY
    TRACEABLE THERETO, and
18
    2011 BMW X3,
19  VIN: 5UXX5C54BL716300,

20  _____ Defendants.

21

22        Plaintiff, the United States of America, brings this complaint in accordance with Supplemental

23  Rule G(2) of the Supplemental Rules for Certain Admiralty or Maritime Claims and Asset Forfeiture

24  Actions, and alleges as follows:

25                              **Nature of the Action**

26        This is a civil action to forfeit and condemn to the use and benefit of the United States of

27  America the proceeds of a violation of the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778 *et*

28  *seq*, that are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

Verified Complaint for Forfeiture *In Rem*          1

**Jurisdiction and Venue**

1. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

2. This Court is the proper venue pursuant to 28 U.S.C. § 1395, because the United States' claim accrued in this district, and the property to be forfeited was seized and/or brought in this district. 28 U.S.C. § 1395(a), (b), (c).

**The Defendants-In-Rem**

3. The defendants *in rem* consist of the following:

   a. The proceeds of a $50,000.00 Bank of America cashier's check sourced from funds withdrawn from the Martel 3D Savings Account on or about October 2, 2014 and made payable to the California Franchise Tax Board (the "Defendant FTB Funds"), and

   b. A 2011 BMW X3, VIN: 5UXX5C54BL716300 (the "Defendant BMW" and, together with the FTB Funds, collectively, the "Defendant Assets").

4. The Defendant FTB Funds were seized on July 30, 2015, and is in the custody of the U.S. Department of Homeland Security, U.S. Customs & Border Protection.

5. The Defendant BWM was seized on July 29, 2015, and is in the custody of the U.S. Department of Homeland Security, U.S. Customs & Border Protection.

**Facts Supporting Forfeiture**

6. The Defendant Assets were seized pursuant to two Seizure Warrants (the "Seizure Warrants") issued on July 29, 2015, by the Hon. Gary S. Austin, United States Magistrate Judge, United States District Court, Eastern District of California.

7. In issuing the Seizure Warrants, the Court found probable cause to believe that the Defendant Assets were the proceeds of AECA violations and therefore subject to seizure and forfeiture to the United States.

8. Each Seizure Warrant was supported by an identical affidavit, that of U.S. Department of Homeland Security, Homeland Security Investigations Special Agent, Calvin J. Kim.

9. The United States' allegations regarding the forfeitability of the Defendant Assets were

Verified Complaint for Forfeiture *In Rem*            2

1  and are set forth in the Affidavit (attached hereto as Exhibit A). Those facts were verified and sworn to

2  under oath by Special Agent Calvin J. Kim and, thus, form the basis of this Verified Complaint.

3  **FIRST CLAIM FOR RELIEF**

4  **(18 U.S.C. § 981(a)(1)(C) – Proceeds of an AECA violation)**

5       10.     The United States repeats and realleges each and every allegation set forth in the above

6  paragraphs (including the attached Affidavit).

7       11.     Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "any property,

8  real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense

9  constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)[.]" Under Title

10 18, United States Code, Section 1956 (c)(7)(D), an AECA violation constitutes a "Specified Unlawful

11 Activity."

12      12.     The Defendant Assets are property, real or personal, which constitutes or is derived from

13 proceeds of a violation of the AECA, 22 U.S.C. § 2778 *et seq.*, or represented proceeds traceable to such

14 property.

15      13.     As a result of the foregoing, the Defendant Assets are therefore liable to condemnation

16 and forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

**Conclusion**

WHEREFORE, the United States respectfully asserts that there is reasonable cause to believe the Defendant Assets are forfeitable to the United States under 18 U.S.C. § 981(a)(1)(C) and requests::

1.    That notice of this action be given to all persons known or thought to have an interest in or right against the Defendant Assets;

2.    Pursuant to Supplemental Rule G(9), this matter is to be scheduled for a bench trial unless any party demands trial in compliance with Federal Rules of Civil Procedure, Rule 38, within 14 days of the service of this pleading;

3.    This Court enter a judgment of forfeiture of the Defendant Assets to the United States;

4.    This Court grant the United States its costs and whatever other relief to which it may be entitled; and

5.    For such other and further relief as the Court deems just and proper.


Dated:  December 23, 2015                                BENJAMIN B. WAGNER
                                                                         United States Attorney


                                                                         /s/ Jeffrey A. Spivak
                                                                         JEFFREY A. SPIVAK
                                                                         Assistant United States Attorney

Verified Complaint for Forfeiture *In Rem*                4

# Exhibit A

SEALED

AO 108 (Rev. 12/03) Case 1:15-cv-01909-LJO-SAB Document 1 Filed 12/23/15 Page 6 of 29

ORIGINAL FILED

# United States District Court

_____EASTERN_____ District of _____CALIFORNIA_____

JUL 29 2015
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

In the Matter of the Seizure of

(Address or brief description of property or premises to be seized)

**APPLICATION AND AFFIDAVIT
FOR SEIZURE WARRANT**

**The proceeds of a $50,000.00 Bank of America cashier's check sourced from funds withdrawn from Bank of America Savings Account #325016557963, held in the name of Martel 3D, on or about October 2, 2014, and made payable to the California Franchise Tax Board**

CASE NUMBER:

1:15 SW 00219 CJS

I, Calvin J. Kim, being duly sworn depose and say:

I am a(n) Special Agent, Homeland Security Investigations, and have reason to believe that

in the _____EASTERN_____ District of _____CALIFORNIA_____
there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized)

**The proceeds of a $50,000.00 Bank of America cashier's check sourced from funds withdrawn from Bank of America Savings Account #325016557963, held in the name of Martel 3D, on or about October 2, 2014, and made payable to the California Franchise Tax Board**

which is (state one or more bases for seizure under the United States Code)

subject to seizure pursuant to 18 U.S.C. § 981(b), and subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461.

concerning a violation of Title _22_ United States Code, Section(s) _2278(c)_, and

The facts to support a finding of probable cause for issuance of a seizure warrant are as follows:

**See attached affidavit.**

Continued on the attached sheet and made a part hereof.  ☒Yes ☐No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

_7/29/15_  at  Fresno, California
Date              City       State

Gary S. Austin, U.S. Magistrate Judge                    _____
Name of Judicial Officer     Title of Judicial Officer    Signature of Judicial Officer

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR SEARCH AND SEIZURE WARRANT**

I, Calvin Kim, Special Agent with the Department of Homeland Security, Homeland Security
Investigations (HSI) being duly sworn, depose and state as follows, to wit:

## INTRODUCTION AND AGENT BACKGROUND

1.      Your affiant is a Special Agent with the Homeland Security Investigations (HSI) and has
been so employed for approximately four years.  Prior to the employment with HSI, your affiant
served as a U.S. Customs and Border Protection Officer for three years.  As a requirement for
employment as an HSI Special Agent, your affiant successfully completed a twelve-week
Criminal Investigator Training Program (CITP) located at the Federal Law Enforcement Training
Center (FLETC) in Glynco, Georgia. At the conclusion of CITP, your affiant completed an
additional twelve-week Immigration and Customs Enforcement Special Agent Training
(ICESAT) Academy.  As part of the training at FLETC, your affiant received extensive
instruction in the areas of Immigration law, Customs law, firearms training, rules of evidence, and
interview techniques.

2.      As a Special Agent with HSI, part of your affiant's duties include the investigation of
criminal violations of import/export law and violations of the Arms Export Control Act ("AECA")
as proscribed by 22 U.S.C. § 2778, and the International Trafficking in Arms Regulations
("ITAR"), as proscribed by 22 C.F.R Part 120, et seq.  Moreover, as a HSI Special Agent, your
affiant is generally authorized to investigate violations of the laws of the United States and to
execute search and seizure warrants issued under the authority of the United States.

3.      Your affiant has also participated in investigations of violations of United States laws
relating to the unlawful export of arms and commodities that are export-restricted for reasons of
national security, foreign policy, and anti-terrorism.  Furthermore, your affiant has received
training related to identifying the techniques, methods, and procedures employed by groups,
organizations, companies in violation of United States export laws.  Finally, your affiant has

1

received specific instruction and training in the conduct of criminal investigations associated with export-law violations, which included investigation associated with violations of the AECA and ITAR.

4.      Based on my training, education, experience and discussions with other federal agents related to the investigation of international export-related violations, I know that maintaining an unlawful export and/or brokering scheme is often labor intensive, in that it involves: (1) the procurement of defense articles from various sources within and/or without the United States; (2) extensive dealings with foreign nationals from foreign countries requesting defense articles; (3) arrangements related to the international exportation of various defense articles from the United States and/or foreign countries to other foreign countries; (4) certain unlawful conduct committed in furtherance of concealing or evading the prohibitions and licensing requirements of the AECA and the ITAR; and (5) the maintenance of business records related to and resulting from the exportation and/or brokering of defense articles and the accrual of illegally derived profits from these activities.

5.      From my training and experience, I know that individuals engaged in illicit activities and/or money laundering of illicit funds will often attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's check, money drafts, traveler's checks, wire transfers, money orders, and other means of value transfer.

6.      Also based on my training and experience, I know that it is common for persons engaged in illegal activity to move the proceeds from illicit activities through multiple bank accounts and financial institutions, using known and unknown individuals, to "layer" the money in a way to provide insulation from detection and to give the money the appearance of legitimacy.   This is done in an attempt to complicate the paper trail and further disguise the true nature and source of

2

the monies.

7.     I make this affidavit under 18 U.S.C. § 981(b) and Rule 41 of the Federal Rules of Criminal Procedure in support of the government's application for the issuance of a warrant authorizing the seizure of certain assets (the "**Assets**") more particularly described herein.

8.     The facts in this affidavit come from your my personal observations, training and experience, and information obtained from other agents and witnesses.   Because this affidavit is being submitted for the limited purpose of obtaining a search and seizure warrant, I have set forth only the facts that I believe are necessary, in compliance with 18 U.S.C. § 981(b) and Rule 41 of the Federal Rules of Criminal Procedure, to establish probable cause that the property to be seized is subject to forfeiture by the United States.

### DESCRIPTION OF PROPERTY TO BE SEARCHED FOR AND SEIZED

9.     This affidavit is submitted in support of the government's application for the issuance of a warrant to search for and seize the following property for civil and/or criminal forfeiture:

    a. The proceeds of a $185,901.17 Bank of America cashier's check sourced from funds withdrawn from Bank of America Savings Account #325016557963 (the "Martel 3D Savings Account (#7963)") on or about October 2, 2014 and made payable to the United States Treasury (the "**IRS Funds**");

    b. The proceeds of a $50,000.00 Bank of America cashier's check sourced from funds withdrawn from the Martel 3D Savings Account (#7963) on or about October 2, 2014 and made payable to the California Franchise Tax Board (the "**FTB Funds**)," and

    c. A 2011 BMW X3 with VIN #5UXX5C54BL716300, California License Plate Number 7FVG036 (the "**BMW**" and, together with **the IRS Funds**, and **FTB Funds,** collectively, the "**Assets**").   The **BMW** is believed to be located at 2525 W. Sierra Ave., Fresno, California, and the government requests authority to search for and seize the **BMW** at that location.

    ///

    ///

    ///

3

## LEGAL BACKGROUND

## ARMS EXPORT CONTROL ACT; THE INTERNATIONAL TRAFFIC IN ARMS REGULATION; BROKERING ACTIVITY

10.     The Arms Export Control Act (AECA), 22 U.S.C. § 2778, regulates the export, import and brokering of military products. The AECA authorizes the President "designate those items which shall be considered as defense articles," and "promulgate regulations for the import and export of such articles. . . ." 22 U.S.C. § 2778(a)(1). The President has delegated rulemaking authority to the Secretary of State, whose office has promulgated the International Traffic in Arms Regulations (ITAR).  22 C.F.R. §§ 120.1-130.17.  The ITAR contain the U.S. Munitions List, which lists categories of "defense articles" that cannot be exported without first obtaining a license from the Department of State (DOS).  22 U.S.C. § 2778(b)(2); 22 C.F.R. §§ 120.6, 121.1, 123.1(a), 129.3.

11.     The registration and licensing requirements originally extended only to those individuals "engage[d] in the business of manufacturing, exporting, or importing" the articles and services on the Munitions List. 18 U.S.C. § 2778(b)(1)(A)(i); *see also* 22 U.S.C. § 2778(b)(2).  In 1996, however, Congress enacted the Brokering Amendment, which expanded the scope of the AECA's registration and licensing requirements to cover every person "who engages in the business of brokering activities with respect to the manufacture, export, import, or transfer of" the articles and services on the Munitions List.  22 U.S.C. § 2778(b)(1)(A)(ii)(I).   The AECA further defines brokering activities as including "the financing, transportation, freight forwarding, or taking of any other action that facilitates the manufacture, export, or import of a defense article or defense service."  22 U.S.C. § 2778(b)(1)(A)(ii)(II).

12.     "Foreign defense articles or defense service" includes any non-United States defense article or defense service of a nature described on the United States Munitions List regardless of whether such article or service is of United States origin or whether such article or service contains United States origin components. 22 U.S.C. § 2778(b)(1)(A)(ii)(IV).

4

13.     The ITAR defines a broker as any person "who engages in the business of brokering activities." 22 C.F.R. § 129.2(a).  A broker includes (1) any U.S. person wherever located; (2) any foreign person located in the United States; and (3) any foreign person located outside the United States where the foreign person is owned or controlled by a U.S. person." 22 C.F.R. § 129.2(a)(1)-(3).

14.     The ITAR defines "brokering activities" as "any action on behalf of another to facilitate the manufacture, export, permanent import, transfer, reexport, or retransfer of a U.S. or foreign defense article or defense service, regardless of its origin." 22 C.F.R. § 129.2(b) (emphasis added). Such action includes, but is not limited to: (i) financing, insuring, transporting, or freight forwarding defense articles and defense services; and (ii) soliciting, promoting, negotiating, contracting for, arranging, or otherwise assisting in the purchase, sale, transfer, loan, or lease of a defense article or defense service. 22 C.F.R. § 129.2(b)(1)(i)-(ii).  Brokering activities also include activities performed by an affiliate.  22 C.F.R. § 129.2(b)(v).  Further, "engaging in the business of brokering activities" requires only one occasion of brokering.  22 C.F.R. § 129.2(c).

15.     The AECA imposes a maximum imprisonment of twenty years and a fine of not more than $1 million.  22 U.S.C.§ 2778(c).  A criminal sanction requires that a person "willfully" violate the statute or its regulations. *Id.*

## APPLICABLE ASSET FORFEITURE STATUTES

16.     A violation of the Arms Export Control Act (22 U.S.C. § 2278(c)) is a Specific Unlawful Activity (SUA).  18 U.S.C. § 1956(c)(7)(D).  Pursuant to Title 18 U.S.C. § 981(a), all property that is the "proceeds" of a violation of an SUA is forfeitable to the United States.  18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461; see United States v. Newman, 659 F.3d 1235, 1240 (9th Cir. 2011) (explaining how Title 18 section 981(a)(1)(C) and Title 28 section 2461 authorize the forfeiture of proceeds of an SUA).  "Proceeds" is defined to include "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including

the gross receipts of such activity." 18 U.S.C. § 1956(c)(9).

17. Title 18 U.S.C. § 981(b) authorizes the seizure of property upon a probable cause showing that the property is subject to forfeiture. Such seizure may be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure. 18 U.S.C. § 981(b)(2).

18. A seizure warrant issued by a judicial officer in one district may be executed in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement. 18 U.S.C. § 981(b)(3).

### SUMMARY OF PROBABLE CAUSE

19. No U.S. person may conduct "brokering activities" without approval from the U.S. State Department, Directorate of Defense Trade Controls (DDTC). Brokering activities include any actions to facilitate the transfer of defense articles. Such activities include any financing relating to the transfer of defense articles. At no point did Ara Dolarian (Dolarian), Dolarian Capital Inc. (DCI) or their affiliates receive DDTC approval to broker defense articles to Nigeria. In fact, DCI did not receive approval to conduct any brokering activities in 2013 or 2014. Yet without the requisite approval, Dolarian, DCI and their affiliates took actions to broker defense articles to Nigeria beginning in or around June 2014 (or earlier) and continuing throughout 2014.

20. Specifically, (1) in early June 2014, DCI entered into Sales Agreements with Nigerian government entities for the sale of weapons (the final of which contracts was valued at $8,616,042.50); (2) in or around September 2014, DCI negotiated with arms vendors and made payments to arms vendors for the acquisition of weapons intended to be transferred to Nigeria; and (3) DCI received $8,618,647.00 in wire transfers from Nigeria (through a series of intermediaries) that appear to be payments for the weapons contracted for between June and September 2014 intended for Nigeria – and such funds were not held in escrow, but were used in part to pay a DCI agent in the Czech Republic and other expenses, and were transferred to bank accounts of various

6

DCI-controlled nominees (a summary chart of these financial transactions is included below). All of these actions were taken without DDTC approval and constitute violations of the AECA.

## FACTUAL BACKGROUND

21.     The U.S. Department of Homeland Security, Homeland Security Investigations (HSI) is currently conducting a joint investigation with the Department of Defense, Defense Criminal Investigative Service (DCIS) into the unlicensed brokering activities of Ara Dolarian (Dolarian), Dolarian Capital Inc. (DCI) and others affiliated with or working on behalf of Ara Dolarian.

22.     DCI is a company incorporated and registered in the state of California.   Record checks with the California Secretary of State, list DCI's address as "1280 WEST SHAW AVENUE, SUITE 102 FRESNO CA 93711."   Dolarian is listed as the Agent for Service of Process.

23.     Open source checks reveal that Dolarian is the president and owner of DCI.   These checks revealed that DCI is an arms brokering company specializing in the sale of arms and munitions manufactured in Eastern European to foreign countries.   DCI's website, www.dolarian.com, states that DCI is registered with the DOS, DDTC as a broker and manufacturer.   The website also advertises a variety of arms ranging from tanks to rifles and pistols.

24.     DCI's "Home" page purports in part that "the Company complies with the requirements and provisions governed by the International Traffic in Arms Regulations Act of 1976."

25.     DCI lists its point of contact email address as Dolarian@Dolarian.com.

26.     Checks with DDTC revealed that Dolarian is registered as the President/CEO of DCI as a broker with brokering registration code K2179.   In as late as 2011, DCI received DDTC approval to engage in certain select brokering activity. According to DDTC records, however, all DCI brokering and export license applications submitted in 2013 and 2014 were "returned without action" or were denied.   This means that during 2013 and 2014, DCI did not have permission to export arms or conduct arms brokering activities.

27.     On June 20, 2013, DDTC placed Dolarian under a policy of presumptive denial. The

7

notification to Dolarian read:

> "This letter is to inform you that until the Department has completed its review and is satisfied that Dolarian Capital is compliant with the ITAR and has an effective defense trade and brokering compliance program in place, all pending and future license applications or other approval requests involving you or Dolarian Capital will be reviewed under a presumption of denial. Following a case-by-case review, exceptions may be granted, however, where the Department determines approval would be in the best interests of U.S. foreign policy or national security."

28.     At no point since the June 20, 2013 DDTC letter has Dolarian or DCI had authorization from DDTC to engage in arms brokering activities.

29.     In November 2014, DDTC conducted a meeting and interview with DCI, attended by Dolarian and Myron Smith (Smith), Dolarian's business partner and DCI's purported in-house counsel.   This meeting was conducted in connection with an administrative investigation DDTC was conducting into Dolarian and DCI in connection with arms brokering activities.

30.     On December 8, 2014, Dolarian submitted a written response to the DDTC inquiry.   This response included a summary of Dolarian's/DCI's activities in 2013 and 2014, as well as several exhibits, which included signed contracts, End User Certificates, correspondence to the DDTC and email communications between Dolarian and his representatives/affiliates.   In January 2015, DDTC provided agents a copy of this correspondence and the exhibits. Several exhibits provided to DDTC are detailed in this affidavit.

## ILLEGAL NIGERIAN BROKERING ACTIVITY

31.     On or about June 9, 2014, Dolarian executed an agreement with Hima Aboubakar, owner of Socite D' Equipments Internaionaux (S.E.I.) and acting for the Government of Nigeria, for the purchase of the munitions listed below:

> Weapon/Munitions
> DEFA Type 553 gun
> Arming wire for 125kg bomb ARM MLE FZA
> Arming wire for 250kg bomb SECU MLE FZA
> Arming wire for 250kg bomb SAMP MLE FZA
> MARTA 155 Type Launch Pad

> 100kg bomb HE
> 250kg bomb
> DEFA ammunition
> Pylon, F71A
> 68 mm SNEB Rocket

The price of the contract was valued at $8,616,042.50.

32.     Open source research indicated that S.E.I has been involved in the attempted procurement of weapons on behalf the Nigerian Government.   Multiple online news articles detailed that S.E.I. was involved in an arms transaction with Cerberus Risk Solutions, a South African arms brokerage company.   The South African government reportedly seized $5.7 million wired to Cerberus by S.E.I. because Cerberus lacked the proper registration to sell and market arms in South Africa. Further, checks in U.S. government databases revealed that S.E.I. has been listed as the consignee (receiving party) on two exports of fuel tanker trucks to S.E.I. in Niger.   Both transactions listed Hima Aboubakar as the point of contact for S.E.I.

33.     The DEFA 553 is a gas-operated five-chamber revolving cannon using pyrotechnic cocking and electrical ignition. It fires a range of 30 mm ammunition in various types, and is capable of continuous fire or of 0.5-second or 1-second bursts.   Based on my training and experience and review of the ITAR Section 121.1, the DEFA 553 is a defense article and is Category II (a), Guns over caliber .50 (12.7mm, whether towed, airborne, self-propelled, or fixed, including but not limited to, howitzers, mortars, cannons and recoilless rifles).

34.     The MATRA 155 launch pad is a SNEB rocket launcher which launches unguided air-to-ground 68 mm (2.7 in) rocket projectiles. The MATRA 155 launch pad designed for launch by combat aircraft and helicopters. Based on my training and experience and review of the ITAR Section 121.1, both the MATRA 155 and its 68mm rockets are defense articles and fall under Category IV- Launch Vehicles, guided missiles, Ballistic Missiles, Rockets, Torpedoes, bombs and Mines.

35.     The 250kg Bomb HE and 100kg Bomb HE are thick-walled metal cased projectiles with explosive filler. These bombs are a common weapon of fighter bomber and attack aircraft. Based

on my training and experience and review of the ITAR Section 121.1, these bombs are defense articles and fall under category IV (a).

36.     On June 13, 2014, Aboubakar instructed Kabirou Abdoulkadri to send a wire transfer of $5,000,000.00 for payment of the Nigerian contract.

37.     On June 17, 2014, roughly a week after Dolarian signed the contract with S.E.I., and four days after Aboubakar requested the $5,000,000.00 wire, Myron Smith received a wire transfer of $4,998,647.00 into a newly-opened JP Morgan checking account 588102975 in Fresno, CA (Smith's Checking Account (#2975)).  Smith had opened the account on April 21, 2014.

38.     The $4,998,647.00 wire transfer was drawn on an HSBC-Hong Kong bank account #640116927838 (the Sawki HSBC Account), held in the name of a Hong Kong-based company, (HK) SK-Sawki Limited (hereafter Sawki).

39.     Open source records checks with the Hong Kong Government business database indicated that Sawki was established in Hong Kong by two citizens of Niger identified as Kabirou Abdoulkadri and Souleymane Siddo.   These same records show that Abdoulkadri and Siddo reside in China. Additional open source record checks indicated that Sawki is listed as a furniture company and has an internet presence as SK-SAWKI FURNITURE CO LIMITED, www.sksawkifurniture.abbo-twins.com.

40.     According to HSBC records, just weeks before Sawki sent the $4,998,647.00 wire transfer to Smith, the Sawki HSBC Account received two wire transfers of $9.999,990.00 (for a total of $19,999,980.00).   The first wire transfer was on May 28, 2014.   The second wire transfer was on June 9, 2014.  Both transfers originated from the National Security Adviser Office, Three Arms Zone, Abuja, Nigeria.   The first wire transfer originated from the Central Bank of Nigeria in Lagos, Nigeria.   The second wire transfer originated from the First Bank of Nigeria PLC in London, England.   A notation for the second wire transfer indicated that the transfer was "Payment for Supply of Technical Equipment."

10

41.     Open source checks indicated that the National Security Adviser Office (NSAO) is an entity of the Nigerian Government under the Office of the President and is located in the Three Arms Zone of Abuja, Nigeria.   According to the United States Defense Attaché for Nigeria, the NSAO was allotted roughly $1 billion by the Nigerian Government in 2014 for the purchase of military equipment. The Defense Attaché advised that each branch of the Nigerian Armed Forces now submits their military equipment requests through the NSAO.

42.     On or about June 19, 2014, after the Nigerian contract was signed and after Smith received $5,000,000.00 from the Nigerian government, DDTC received a Brokering Application addressed to DDTC.   DDTC assigned tracking number "BA-L-039-14" to DCI's application package.

43.     In the brokering application, Dolarian and DCI requested permission to broker the sale of certain defense articles listed below to the Ministry of Defense, Nigerian Army.   Contained in the application package is an equipment list that details the following munitions DCI sought to sell to Nigeria:

> 20x110mm ammunition
> 20x110mm auto cannon
> DEFA 155 type gun
> Arming wire for 125kg bomb ARM MLE FZA
> Arming wire for 250kg bomb SECU MLE FZA
> Arming wire for 250kg bomb SAMP MLE FZA
> MARTA 155 Type Launch Pad
> Pylon, F71A
> 100kg bomb HE
> 250kg bomb

44.     Most of the items detailed in brokering application BA-L-039-14 are the same items listed in the executed sales agreements detailed in paragraphs 36 and 38 (many of which are "defense articles" under ITAR).

45.     While DCI's June 19, 2014 brokering request was pending with DDTC, DCI, Dolarian and Smith conducted a series of financial transactions in the United States with the proceeds of the $4,998,647.00 wire transfer they had received from Nigeria (through Sawki).

46.     On or about June 20, 2014, Dolarian and DCI opened two new bank accounts with JP

11

Morgan Chase: (1) a business savings account in the name of DCI with JP Morgan Chase, which was assigned account number 3097758329 (#8329) with Dolarian is listed as President of DCI, and with Smith and Dolarian's wife, Mary Ann Dolarian, as additional signers on the account (the DCI savings account (#8329)), and (2) a business checking account in the name of DCI with JP Morgan Chase, this account was assigned account number 605982300 (#2300) with Dolarian listed as President of DCI, and with Smith and Mary Anne Dolarian as additional signers on the account (the DCI checking account (#2300)).

47.       Later that day, on June 20, 2014, Smith withdrew $4,199,646.57 from Smith's Checking Account (#2795), and those funds were deposited into the DCI savings account (#8329).   Further, $497k was transferred into the DCI checking account (#2300).   Thus, by June 20, 2014, $4,696,646.00 of the $4,998,647.00 wire transfer was in the newly created DCI bank accounts.

48.       On or about June 24, 2014, DCI drew a $150,000.00 check from the DCI checking account (#2300), which was deposited into the bank account of another Dolarian-controlled company, Martel 3D, LLC.   That Martel 3D bank account was a Bank of America checking account with account number 000577161654 (**Martel 3D Checking Account**).   Agents searched MARTEL 3D in the California Department of State database. The search revealed that Mary Ann Dolarian (Dolarian's wife) is the Agent for Service for Martel 3D. The company's registered address is 2525 W Sierra Ave, Fresno, CA 93711. This is the home address of Ara and Mary Ann Dolarian.

49.       On June 26, 2014, DCI and Marion George Ford III (Ford III) entered in to an agency agreement whereby Ford III agreed to be a representative of DCI in Eastern Europe. The agreement stated:   "WHEREAS, Principal is a reseller/manufacture of various Defense products of Eastern and Western origin and desires to appoint Representative as its [non-exclusive] sales Representative to promote and sell Principal's products."

50.       On June 30, 2014 (four days after DCI and Ford III entered into the agency agreement), DCI wired $712,051.13 to Ford III from the DCI checking account #2300 to Ford III's Czech

12

Republic-based bank account, UniCredit Bank account 0000056985021.

51.     On July 23, 2014, DCI transferred $3,599,823.67 from the DCI savings account #8329 back to Smith's Checking Account (#2975). On July 24, 2014, DCI transferred $169,717.85 from the DCI checking account #2300 back to Smith's Checking Account (#2975). Those two transfers left the DCI savings account #8329 and the DCI checking account #2300 with zero balances.

52.     Thus, after July 24, 2014, just roughly a month after the two DCI accounts had been opened and after roughly $5,000,000 had flowed through them, no additional transactions would flow through the two newly-created DCI bank accounts.   They were subsequently closed.

53.     With the bulk of the Nigeria-originated funds back in Smith's Checking Account (#2975), on July 29, 2014, Smith moved $3,000,000.00 by cashier's check from Smith's Checking Account (#2975) to another of Smith's bank accounts at JP Morgan Chase, Smith's money market account #3302611677.   Then on August 26, 2014, Smith transferred an additional $160,000.00 from Smith's Checking Account (#2975) to Smith's money market account (#1677).   These transfers were conducted with no apparent business purpose.

54.     In or around July 2014, Smith created a new California corporation, "Arthur Ave. Consulting, Inc." in Fresno, California.   The registered agent is Myron Smith at 1284 W Shaw #103, Fresno, CA 93711.   Dolarian and his wife would soon after open two accounts with Citibank in the name of Arthur Ave. Consulting, Inc. (the Arthur Ave. Checking Account and the Arthur Ave. Money Market Account), and the money that originated from Nigeria would soon flow into these two accounts.

///

///

///

13

secondary examination.   During this examination, Dolarian explained that after leaving Iraq he traveled to the Czech Republic where he had additional business meetings including meeting with two brokers from Nigeria that he identified as "Mamu and Hima."   Dolarian told CBP officers that he spoke with the brokers about future business.   Based on my knowledge of this case and my training and experience, I believe that "Hima" is Hima Aboubakar, the S.E.I. representative with whom DCI had entered into Sales Agreements for arms sales to Nigeria.

59.     On August 25, 2014, Mary Ann Dolarian purchased a 2011 BMW X3 (the **BMW**) from BMW of Fresno.   Mary Ann Dolarian purchased the **BMW** with a $33,861.60 check drawn on the Martel 3D Checking Account.   The Martel 3D Checking Account, upon which the $33,861.60 check was drawn, received $150,000.00 in Nigerian proceeds on June 20, 2015 from the DCI Checking Account (paragraph 48 above).   The DCI Checking Account had received that $150,000 as part of a $497,000 transfer on June 20, 2014 from Smith's Checking Account (paragraph 47 above).   Smith's Checking Account had received those monies from Nigeria through Sawki (paragraph 37 above).   A copy of the check for the **BMW** is below:



60.     I have reviewed e-mail correspondence between Dolarian and Ford III. September 2014 emails between Dolarian and Ford III indicate that even though DDTC had not authorized DCI to

conduct brokering activity, DCI had already made a down payment with a supplier for some of the weapons DCI sought to broker to Nigeria. The emails further indicate that DCI was having issues with that supplier and was continuing to look for a new source of supply for the weapons.

61.     On September 4, 2014, Ford III emailed to Dolarian to obtain a status on the acquisition of certain items DCI sought to broker to Nigeria that were covered by the Sales Agreements and the DCI brokering application to DDTC:

> From: Marion Ford (mailto:mgfiii@gmail.com)
> Sent: Thursday, September 4, 2014 2:14PM
> To: Ara Dolarian
> Subject: Re: Up Date
>
> So we can still manage the deal right or are the supplier chain for these particular items?

62.     Later that day, on September 4, 2014, Dolarian responded that although he had obtained a vendor for some of those items (the 68 mm SNEB Rocket (SNEB), the DEFA Type 553 Cannon (DEFA), and MARTA 115 Type Launch pad (MARTA)), he was having issues with that vendor. Dolarian's email to Ford III indicated that DCI had already made a down payment with that vendor:

> On Sep 4, 2014 5:35AM, "Ara Dolarian" <dolarian@dolarian.com> wrote:
>
> Our first vendor for the SNEB, DEFA, and Marta is absolutely and 100% gone and will not sell to the Nigerians under any circumstance. Do not have the Nigerian's produce another EUC for the SNEB, DEFA, and or Marta until instructed.
>
> In the next few days or as soon as I get my money back from the first vendor I will instruct on who the second vendor is. Export will not be Bulgaria for the SNEB, DEFA, and Marta.

63.     The next day, on September 5, 2014, Ford III asked for clarification on how much the new vendor would charge for those weapons:

> From: Marion Ford (mailto:mgfiii@gmail.com)
> Sent: Friday, September 05, 2014 2:30AM
> To: Ara Dolarian

16

Subject: RE: Up Date

How Much? I thought you had released the first vendor anyway? I do remember you telling me about this better source. I will be back in Prague tomorrow. You in Kiev? You need some help?

64.     Dolarian responded that he was in active negotiations with a second vendor regarding the acquisition of the weapons:

On Sep 5, 2014 4:21AM, "Ara Dolarian" < dolarian@dolarian.com> wrote:

The DEFA, MARTA and SNEB, I will have secure by Sunday morning. . . .   The first vendor will not return the deposit as I expected.

65.     The weapons mentioned in the above emails are the same items covered by June 2014 contract between DCI and S.E.I., for which DCI sought DDTC approval, which was denied on August 8, 2014.   These emails indicate that not only did DCI make a deposit for the purchase of weapons even though it had not obtained DDTC's approval, but that DCI continued to actively negotiate for the acquisition of those weapons in September 2014, after DDTC had expressly denied DCI's brokering request.   Both actions violate the AECA.

66.     Throughout September 2014, DCI, Dolarian and Smith also continued to move the proceeds of the June 17, 2014 $4,998,647.00 wire they had received from Sawki.

67.     On September 5, 2014, Mary Ann Dolarian opened a second Martel 3D bank account, a Bank of America savings account number 325016557963 (the Martel 3D Savings Account (#7963)). Mary Ann Dolarian is the sole authorized signer on the account, as the "Manager" of Martel 3D.

68.     On September 8, 2014, Smith purchased a $3,200,000.00 cashier's check ($3,000,000 from Smith's money market account (#1677) and $200,000 from Smith's Checking Account (#2975)). That $3,200,000.00 cashier's check was deposited into the Martel 3D Savings Account (#7963).

69.     On September 11, 2014, more Nigerian funds arrived into Smith's Checking Account (#2975): S.E.I. wired $3,620,000.00 to Smith's JP Morgan Chase account (#2975).   On

17

September 12, 2014, the day after those funds were received, Smith transferred $3,600,000 out of Smith's Checking Account (#2975) and into Smith's money market account (#1677).

70.     On September 23, 2014, Smith purchased a cashier's check in the amount of $3,626,855.52.  Of that amount, $3,263,412.61 was withdrawn from Smith's money market account (#1677) and $363,442.91 was withdrawn from Smith's Checking Account (#2975).   That $3,626,855.52 cashier's check was deposited into the Martel 3D Savings Account (#7963).

71.     Thus, after the deposits of the September 8, 2014 and September 23, 2014 cashier's checks, a total of $6,826,855.52 in Nigeria-originated funds had been funneled from Smith's accounts into the Martel 3D Savings Account (#7963).

72.     On or about October 2, 2014, two cashier's checks were drawn on the Martel 3D Savings Account (#7963) for the benefit of Ara and Mary Ann Dolarian.

73.     The first cashier's check was submitted to the United States Treasury in the amount of $185,901.17.   In the memo line, the check references the social security numbers of Ara Dolarian (XXX-XX-4070) and Mary Ann Dolarian (XXX-XX-5982).   The check references IRS Form 1040 and the years 2007, 2008, 2011.   A copy of the check is below:



///

18

74.    The second cashier's check was submitted to the California Franchise Tax Board ("FTB")

in the amount of $50,000.00.   In the memo line, the check references the social security numbers

of Ara Dolarian (XXX-XX-4070) and Mary Ann Dolarian (XXX-XX-5982).   The check

references FTB Form 540 and the years 2007, 2008, 2010.   A copy of the check is below:



75.    The IRS and FTB cashier's checks were paid with funds withdrawn from the Martel 3D

Savings Account (#7963).   Those funds, the $185,901.17 in the custody of the United States

Treasury (the **IRS Funds**) and the $50,000.00 in the custody of the California Franchise Tax

Board (the **FTB Funds**), are traceable to monies received from Nigeria as proceeds of illegal arms

trafficking, in violation of the Arms Export Control Act (22 U.S.C. § 2778).

///


///


///


///


19

# Ara Dolarian et al. Investigation
## 2014 Brokering Activity – Summary Chart
**(All dates are on or about, all dollar values rounded)**

## The Assets To Be Seized Reflected in Red



Nigerian National Security Advisor's Office

$20 million
5/28/14 &
6/9/14

SK Sawki Limited
Hong Kong Furniture Company
Souleyman & Kabrai (Niger)

Societe D'Equipments Internationau
(Abuja, Nigeria)
Hima Aboubakar (Niger)

$5 million
6/17/14

$3.62 million
9/11/14

$4.7 million
6/20/14

Myron Smith, Attorney
(Fresno)

$3.8 million
7/23/14,
7/24/14

$6.8 million
9/8/14 & 9/24/14

Dolarian Capital Inc.
Ara Dolarian
(Fresno)

$0.15 million
6/24/14

Martel 3D Savings Account
Martel 3D Checking Account
(Fresno)

21

### SUMMARY OF TRACING

78.     In summary, agents have directly traced the **Assets** to the approximately $8,618,647.00

obtained from Nigeria (through Sawki and S.E.I.) believed to be proceeds of illegal brokering

activity, as more described below:

a.  The proceeds of a $185,901.17 Bank of America cashier's check sourced from funds
    withdrawn from Bank of America Savings Account #325016557963 (the "Martel 3D
    Savings Account (#7963)") on or about October 2, 2014 and made payable to the
    United States Treasury (the "**IRS Funds**");

    Summary of Tracing:  On June 17, 2014, Smith received a $4,998,647.00 wire
    transfer from Nigeria though Sawki.  On September 11, 2014, Smith received a
    $3,620,000.00 wire transfer from Nigeria through S.E.I.  These two wires totaled
    $8,618,647.00.  Between September 8, 2014 and September 23, 2014, Smith
    and/or others moved $6,826,855.52 of this $8,618,647.00 into the Martel 3D
    Savings Account (#7963).

    On October 2, 2014, the **IRS Funds** were withdrawn from the Martel 3D Savings
    Account (#7963) and sent to the U.S. Treasury for Ara and Mary Ann Dolarian.

b.  The proceeds of a $50,000.00 Bank of America cashier's check sourced from funds
    withdrawn from the Martel 3D Savings Account (#7963) on or about October 2, 2014
    and made payable to the California Franchise Tax Board (the "**FTB Funds**");

    Summary of Tracing:  On June 17, 2014, Smith received a $4,998,647.00 wire
    transfer from Nigeria though Sawki.  On September 11, 2014, Smith received a
    $3,620,000.00 wire transfer from Nigeria through S.E.I.  These two wires totaled
    $8,618,647.00.  Between September 8, 2014 and September 23, 2014, Smith
    and/or others moved $6,826,855.52 of this $8,618,647.00 into the Martel 3D
    Savings Account (#7963).

    On October 2, 2014, the **FTB Funds** were withdrawn from the Martel 3D Savings
    Account (#7963) and sent to the FTB for the benefit of Ara and Mary Ann Dolarian.

c.  A 2011 BMW X3 with VIN #5UXX5C54BL716300, California License Plate Number
    7FVG036 (the "**BMW**).

    Summary of Tracing:  On June 24, 2014, $150,000.00 was deposited into the
    Martel 3D Checking Account through the now-closed DCI checking account
    (#2300), which account received the Sawki funds through Smith.  On August 25,
    2014, Mary Ann Dolarian purchased the **BMW** from BMW Fresno using a
    $33,861.60 check drawn on the Martel 3D Checking Account.

## PROBABLE CAUSE FOR ENTRY ONTO PREMISES LOCATED AT 2525 WEST SIERRA AVE. FRESNO, CALIFORNIA TO EXECUTE SEIZURE WARRANT

79.     There is probable cause to believe that the **BMW** will be located at 2525 W. Sierra Ave., Fresno, California (the Residence).   The search and seizure warrant requests authority to enter through the security gate and onto the driveway or into the garage of the Residence to search for and seize the **BMW**.   No other search of the Residence will be conducted.

80.     According to DMV records, the **BMW** is registered to Mary Ann Dolarian.   Both the vehicle and Mary Ann Dolarian list the Residence as their address on file with the DMV.

81.     On or about January 31, 2015, while conducting surveillance at the Residence, agents observed the **BMW** parked in the driveway of the Residence.

82.     On July 24, 2015 at 3:27 pm, agents conducting surveillance at the Residence again located the **BMW** parked in the driveway at the Residence. A photo is provided below.



23

## CONCLUSION

83.    I believe that there is probable cause to believe that the **Assets** are proceeds of illegal arms brokering, in violation of AECA and ITAR.

84.    DCI, Dolarian, and Smith did not have authorization from DDTC to conduct brokering activity for the sale of weapons and munitions to Nigeria.  Yet without requisite approval, Dolarian, DCI and his affiliates took actions to broker defense articles to Nigeria beginning in or around June 2014 (or earlier) and continuing throughout 2014.

85.    Specifically, (1) in early June 2014, DCI entered into Sales Agreements with Nigerian government entities for the sale of weapons (the final of which contracts was valued at $8,616,042.50); (2) in or around September 2014, DCI negotiated with arms vendors and made payments to arms vendors for the acquisition of weapons intended to be transferred to Nigeria; and (3) DCI received $8,618,647.00 in wire transfers from Nigeria (through a series of intermediaries) that appear to be payments for the weapons contracted for between June and September 2014 intended for Nigeria (and such funds were not held in escrow but were used in part to pay a DCI agent in the Czech Republic and other expenses, and were transferred to bank accounts of various DCI-controlled nominee companies).  All of these actions were taken without DDTC approval.

86.    The **Assets** to be seized in this case – the **IRS Funds**, the **FTB Funds**, and the **BMW** – are directly traceable to the $8,618,647.00 obtained by wire from Nigeria.  Therefore the **Assets** are subject to seizure and forfeiture as proceeds of the specified unlawful activity of unlawful brokering activities in violation of the AECA and ITAR, pursuant to 18 U.S.C. §§ 981(a)(1)(C), 1956(a)(7) and 28 U.S.C. § 2461.

87.    Lastly, there is probable cause to believe the **BMW** is located at the Residence.

///

///

///

///

24

## REQUEST FOR SEALING

88.     I further request that the Court order that all papers in support of this application, including

the affidavit and search and seizure warrant, be sealed until further order of the Court.   These

documents discuss an ongoing criminal investigation.   Accordingly, there is good cause to seal

these documents because their premature disclosure may seriously jeopardize that investigation

and may lead to the concealment or dissipation of assets.


Respectfully submitted,


Special Agent Calvin Kim
Homeland Security Investigations

Subscribed and sworn to before me this 29 day of July, 2015.


HON. GARY S. AUSTIN
United State Magistrate Judge

Approved as to form:

/s/ JEFFREY A. SPIVAK
JEFFREY A. SPIVAK
Assistant U.S. Attorney

25